RAYMOND ROSENFIELD *v.* THE METALS SELLING
CORPORATION

RAYMOND ROSENFIELD *v.* NORMAN ROSENFIELD ET AL.

RAYMOND ROSENFIELD *v.* METALMAST MARINE, INC.

RAYMOND ROSENFIELD *v.* NORMAN ROSENFIELD ET AL.
(14697)

BORDEN, BERDON, NORCOTT, KATZ and DUPONT, Js.

Argued January 13—decision released June 28, 1994

*Matthew J. Forsladt*, with whom were *Ann M. Sic-zewicz* and *Lewis G. Schwartz*, for the appellant-appellee (defendant Norman Rosenfield).

*Janet C. Hall*, with whom was *Daniel F. Sullivan*, for the appellee-appellant (plaintiff Raymond Rosenfield).

BORDEN, J. The principal issue in this appeal and cross appeal is, under the facts of the case, the extent to which the business judgment rule shields a corporate officer from liability for depletion of corporate assets. This appeal is the culmination of a business dispute between two brothers, the plaintiff, Raymond Rosenfield, and the defendant Norman Rosenfield.[1] The dispute involved two close corporations, the defend-

---

[1] Norman Rosenfield died on February 23, 1994, and we granted permission to substitute his executrix as defendant. We will continue to refer to Norman Rosenfield as the defendant.

ants Metals Selling Corporation (Metals Selling) and Metalmast Marine, Inc. (Metalmast), owned and managed by the Rosenfields. Norman appeals and Raymond cross appeals from the judgment of the trial court. That judgment rejected in part the findings of a court-appointed auditor favorable to Norman and adverse to Raymond.[2]

On his appeal, Norman challenges: (1) the standard of review employed by the trial court in connection with its review of the auditor's findings; and (2) the court's finding that Norman was not entitled to reimbursement for certain posttrial attorney's fees and rental payments. On his cross appeal, Raymond challenges the trial court's conclusions that: (1) Norman's management of Metals Selling, during the period when it was under his sole control and when its assets were substantially depleted, was protected by the business judgment rule and was not a breach of the duty of care owed by Norman to the shareholders of Metals Selling; (2) payment of the legal fees of Schatz & Schatz, Ribicoff & Kotkin (law firm) by the two defendant corporations for representation of both the defendant corporations and Norman in this litigation was proper; (3) salary increases and bonuses paid to Norman's son, Paul Rosenfield, an employee of Metalmast, and rental payments made by Metals Selling to Norman, were not voidable self-dealing transactions; and (4) the assessment of the costs of the appraisal proceedings against Norman was not required pursuant to General Statutes § 33-384. We affirm the judgment of the trial court.

The record discloses the following facts. In 1938, Raymond settled in Putnam and began a career in busi-

---

[2] Norman appealed and Raymond cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the case to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

ness. He was joined thereafter by his younger brother Norman, with whom he founded Metals Selling on the western bank of the Quinebaug River.[3] Metals Selling processed various metals and was primarily engaged in the business of grinding magnesium under contract. Subsequent to founding Metals Selling, Raymond and Norman diversified their line of business in 1958 by forming Metalmast, a manufacturer of aluminum masts and sailboats. Throughout the existence of the two corporations, either Raymond and Norman individually, or their respective immediate families, each owned 50 percent of the voting capital stock of Metals Selling and Metalmast. From the time of incorporation of Metals Selling and Metalmast, Raymond and Norman were officers and directors of both companies. From the 1940s through the beginning of the 1980s, the two brothers worked together in the two companies running them by "consensus and agreement."

Although both brothers were equal owners of the two companies, from the 1940s through some time in the 1970s, Raymond exercised more authority in the businesses than did Norman. Norman's and Raymond's children became employees of the two companies. Norman's son, Paul Rosenfield, was employed by Metalmast. Raymond's children, Charles Rosenfield and Katherine Rosenfield, were employees of Metals Selling.

During 1984, after Raymond had partially retired, relations between Raymond and Norman, and between their respective families, deteriorated markedly. Raymond's children were not able to work with Norman as their superior. Raymond proposed solutions to these

---

[3] The record is contradictory on the date of the establishment of Metals Selling. In one section it refers to the founding, by Raymond alone, in 1938, and in another, it indicates that Raymond and Norman jointly formed Metals Selling in 1942. The record is clear that Metals Selling was jointly owned by the families of Raymond and Norman.

problems to which Norman did not agree. Raymond then suggested that the brothers' business interests be separated. Norman first ignored the suggestions and then refused. At this time, Raymond significantly diminished his working hours, so that by early 1985, he had no involvement with the companies' activities. Thereafter, Metalmast and Metals Selling were controlled by Norman.

By 1986, Raymond insisted on the separation of the business interests of the two brothers. Norman resisted. Subsequently, in 1988, Raymond commenced these four actions. Two actions sought dissolution of Metals Selling and Metalmast pursuant to General Statutes § 33-382 (a).[4] The other two actions were derivative suits seeking, on behalf of the companies, damages from Norman.

Prior to answers being filed by the defendants in these actions, Norman and Raymond entered into an agreement (stipulation) in an effort to narrow the issues dividing them and to settle the dispute. Pursuant to the stipulation, Norman and Raymond agreed to the appointment of an auditor, who was charged with the valuation of Metals Selling and Metalmast and other-

---

[4] General Statutes § 33-382 provides in relevant part: "PETITION FOR WIND-UP OF AFFAIRS BY SUPERIOR COURT. (a) The superior court for the judicial district where the principal office of a corporation is located, or any judge thereof, shall wind up the business and affairs of such corporation on petition of the following persons in the following cases: (1) In a proceeding by a holder or holders of shares having voting power sufficient under the circumstances to dissolve the corporation pursuant to the certificate of incorporation; (2) in a proceeding by a shareholder or a director when it is established that: (i) Under the provisions of this chapter or of the certificate of incorporation or bylaws, the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, or (ii) the shareholders are deadlocked in voting power for the election of directors and for that reason have been unable at the next preceding annual meeting to agree upon or vote for directors as successors to directors whose term would normally have expired upon the election of their successors."

wise resolving all claims between the two brothers arising out of their working and corporate relationship over the previous forty years.[5] The stipulation established a procedure for the submission of evidence to the auditor, and provided that the auditor's report was to be filed with the trial court. The stipulation provided further that the auditor's report was subject to protest by either brother at a hearing before the trial court, and that the brothers could conduct discovery prior to that hearing, call witnesses, and subject witnesses to cross-examination. The stipulation stated that the trial court was under "no obligation to either accept or reject" the auditor's report. The stipulation did not, however, refer to chapter 15 of the Practice Book,[6] or specify the standard of review to be applied by the trial court to the auditor's report.

---

[5] The stipulation expressly excluded consideration by the auditor of claims between the two brothers arising out of their joint ownership of a motel. Those claims are not at issue in this case.

[6] Chapter 15 of the Practice Book sets forth a set of procedures for referring matters to trial referees for findings of fact. Factual determinations are made by the trial referee, and are ordinarily entitled to deference by the trial court. The scope of matters to be referred to a trial referee and the role of such referee are set forth in general terms in Practice Book § 430.

Practice Book § 430 provides: "REFERENCE TO TRIAL REFEREE

"In addition to matters required to be referred to a trial referee, the judicial authority may refer any civil nonjury case or, with the written consent of the parties or their attorneys, any civil jury case, pending before such court, in which the issues have been closed, to a trial referee, who shall have and exercise the powers of the superior court in respect to trial, judgment and appeal in such case. Any case referred to a trial referee shall be deemed to have been referred for all further proceedings and judgment, including matters pertaining to any appeal therefrom, unless otherwise ordered before or after the reference. The court may also refer to a trial referee any motion for summary judgment and any other pretrial matter in any civil nonjury or civil jury case."

The effect of a reference is set forth in Practice Book § 432, which provides: "EFFECT OF REFERENCE

"When any case shall be referred to a committee, no trial will be had by the court unless the reference be revoked upon stipulation of the parties or order of court. Any reference shall continue in force until the duties of the committee thereunder have been performed or the order revoked.

Both brothers submitted claims to the auditor. The claims ranged from the significant[7] to the petty.[8] In total, Raymond submitted forty-three pages of claims against Norman, and Norman submitted nine pages of claims against Raymond.

The auditor's report rejected substantially all of Raymond's claims against Norman and accepted substantially all of Norman's claims against Raymond. Pursuant to the stipulation, an evidentiary hearing was held on the auditor's report in the trial court.[9] After determining that no special deference was to be accorded to the findings of the auditor, the trial court rejected the auditor's findings in favor of Norman's claims against Raymond, and accepted the auditor's findings rejecting Raymond's claims against Norman. In short, the trial court did not disturb the allocation of assets

"In making a reference in any eminent domain proceeding, the court shall fix a date not more than sixty days thereafter, unless for good cause shown a longer period is required, on which the parties shall exchange copies of their appraisal reports. Such reports shall set forth the valuation placed upon the property in issue and the details of the items of, or the basis for, such valuation. The court may, in its discretion and under such conditions as it deems proper, and after notice and hearing, grant a further extension of time, beyond that originally fixed, to any party confronted with unusual and special circumstances requiring additional time for the exchange of appraisal reports."

See generally 1 Connecticut Practice–Practice Book Annotated (3d Ed. 1989 W. Moller & W. Horton) c. 15.

[7] For example, Raymond asserted a claim against Norman for waste of corporate assets in excess of $1,000,000, and Norman asserted a claim against Raymond for excessive compensation of more than $90,000 paid by Raymond to his children, Charles and Katherine.

[8] For example, Raymond asserted claims against Norman for misuse of the corporate sailboat and corporate payment of private club fees, and Norman asserted a claim against Raymond for personal use of a 1968 Oldsmobile belonging to Metals Selling.

[9] This method of alternative dispute resolution overseen by the trial court, *Spada, J.*, had the beneficial effect of significantly reducing the number of claims ultimately pressed in the trial court. It served to focus the dispute between the brothers to more significant issues and to allow the trial court, and this court, to focus its energies on the resolution of those issues.

existing between Raymond and Norman at the beginning of the dispute. This appeal and cross appeal followed.

## I

### THE APPEAL

#### A

On appeal, Norman first claims that the trial court improperly accorded an incorrect standard of review to the findings of the auditor. He argues that the language of the stipulation mandated deference by the trial court to the findings of the auditor, because the auditor's report was subject to the provisions of chapter 15 of the Practice Book, and that the trial court improperly failed to accord the findings in the auditor's report the appropriate deference. This claim is without merit.

The standard of review to be accorded the auditor's finding was not specified in the stipulation. The stipulation did not refer to chapter 15 of the Practice Book. See footnote 6. None of the applicable procedures specified in the Practice Book for creating a reference were followed either in the stipulation or in the auditor's report. Those procedures include the closing of pleadings and the filing of a claims list pursuant to Practice Book § 433.[10] In addition, under Practice Book §§ 435 through 440, parties seeking to challenge the report of an auditor appointed pursuant to such a reference are afforded very limited rights. These rights do not include the right to conduct discovery after the report has been filed with the trial court, the right to an evidentiary hearing, or the right to cross-examine witnesses.

---

[10] Practice Book § 433 provides in relevant part: "PLEADINGS

"No case shall be referred to a committee until the issues are closed and a trial list claim filed. Thereafter no pleadings may be filed except by agreement of all parties or order of court. Such pleadings shall be filed with the clerk and by him transmitted to the committee."

The language of the stipulation provided for the appointment of an auditor, whose report when presented to the trial court would be "subject to protest by either Norman or Raymond." The stipulation further provided that "[t]he court [was] under no obligation to accept or reject the auditor's report," and that there would be an evidentiary hearing on the auditor's report that would be subject to procedural due process. The stipulation further afforded both brothers the right to conduct discovery and cross-examine witnesses in connection with the evidentiary hearing.

Absent a clearly expressed intention of the parties, the construction of a stipulation is a question of fact committed to the sound discretion of the trial court. See *Central Connecticut Teachers Federal Credit Union* v. *Grant,* 27 Conn. App. 435, 437, 606 A.2d 729 (1992). A "stipulation . . . must be construed according to the intention of the parties as expressed in the language used in the document itself . . . ." *Foley* v. *Foley,* 149 Conn. 469, 471, 181 A.2d 607 (1962). Unless the language is so clear as to render its interpretation a matter of law, the question of the parties' intent in entering into a stipulation is a question of fact that is subject to the "clearly erroneous" scope of review. *Thompson & Peck, Inc.* v. *Harbor Marine Contracting Corp.,* 203 Conn. 123, 130, 523 A.2d 1266 (1987). The trial court determined that the parties did not intend by the stipulation to create a reference under chapter 15 of the Practice Book, or to have the trial court give the conclusions of the auditor any particular weight. These factual determinations are supported by a fair reading of the stipulation, and are not clearly erroneous.

B

Norman next claims that the trial court improperly rejected his posttrial motion for certain attorney's fees. He argues that the trial court improperly concluded

that the stipulation did not provide for payment of his legal fees to the law firm. We disagree.

The stipulation provided that the judgment of the trial court was to be res judicata, subject to rights of appeal, as to *all* claims that any party had against another. The trial court determined that Norman had failed to submit any claims for attorney's fees to the auditor or to the trial court. It concluded, therefore, that he was precluded from raising these claims post-trial. In addition, the only relevant facts in the record indicate that the legal fees of the law firm through May 21, 1991, in this matter were paid by Metals Selling and Metalmast, not by Norman.

The interpretation of the stipulation was within the discretion of the trial court. See *Central Connecticut Teachers Federal Credit Union* v. *Grant,* supra, 27 Conn. App. 437; *Niles* v. *Niles,* 9 Conn. App. 240, 245, 518 A.2d 932 (1986). Because the facts in the record provided a sufficient basis for the trial court's reading of the stipulation regarding this claim, we decline to disturb that determination.

C

Norman's final claim is that the trial court improperly rejected his claim for a retroactive increase in certain rental payments from Metals Selling and Metalmast to him. He argues that the trial court's determination that the fair market rental value of his property was $10,000 per month necessitated a conclusion that the corporations, which were paying an aggregate rental of $9000 per month for the premises, were in arrearage. He argues that the trial court's rejection of his posttrial claim, in light of its earlier determination, was improper. This claim is without merit.

The following facts are relevant to this claim. Norman and Raymond had been joint owners of property

on which Metalmast and Metals Selling conducted a substantial portion of their operations. Subsequent to the breakdown of harmonious relations between Raymond and Norman, this property was the subject of a blind auction between the two brothers. In the auction, Raymond's marker was drawn and he elected to sell his one-half interest in the property to Norman for the price that had been specified by Norman.[11] As noted above, Metalmast and Metals Selling were tenants on the property. After acquiring Raymond's interest in the property, Norman directed Metals Selling to pay him the $5000 per month in rent that it had been previously paying to Metalmast as a subtenant on the property. The trial court concluded that the fair market rent for the property was $10,000 per month.[12]

The trial court's determination of the fair market rental for the property in question was made in response to a claim by Raymond that the rental payments by the corporations to Norman constituted voidable self-dealing. Norman did not make any claim to the auditor that the rental payments he was receiving were insufficient. Indeed, it would have been within his power to increase the rental payments he received from the corporations during the time he was in sole control of them had he believed the rental payments to be insufficient. A finding that the fair market rental proceeds from a particular property exceed the actual rent charged by the landlord does not automatically establish an entitlement for a judicially mandated retroactive increase in rental payments. Norman offers no authority for his claim, nor can we conceive of any.

[11] Norman had specified $1,200,000 as the price at which he would either buy or sell an undivided full interest in the real property. Accordingly, Raymond was paid $600,000 for his one-half interest therein.

[12] In addition to the $5000 per month he received from Metals Selling, Norman also received rental payments of $4000 per month from Metalmast for an aggregate rental payment of $9000 per month.

## II

## THE CROSS APPEAL

### A

On his cross appeal, Raymond first claims that the trial court incorrectly determined that Norman's management of Metals Selling, during the period it was under his sole control and its assets were substantially depleted, was protected by the business judgment rule and did not constitute a violation of the duty of care owed by Norman to the shareholders of Metals Selling. He argues that the trial court's determination that Norman's conduct was not so egregious as to constitute fraud or gross mismanagement was an improper application of the business judgment rule. We disagree.

The following additional facts are relevant to this claim. After Raymond's retirement from the management of the companies in 1985, he did not participate in the management of either company. Raymond's son, Charles, left Metals Selling in 1985, and Raymond's daughter, Katherine, left Metals Selling in 1987. Thereafter, Metals Selling ceased to grind magnesium. All activities at Metals Selling, other than the redevelopment of a hydroelectric facility on the Quinebaug River known as the upper power site,[13] essentially ceased. Unsurprisingly, during this time period, there was a substantial diminution in the operating income of Metals Selling. During the period from 1988 to 1991, the operating income of Metals Selling was approxi-

---

[13] Raymond and Norman produced electricity intermittently at two sites in Putnam during the course of their business career. Originally, they desired to exploit proximity to the Quinebaug River to produce electricity for use by Metals Selling and Metalmast. Later, at least one of the facilities produced electricity that was sold to Connecticut Light and Power Company. Substantial disputes between the two brothers that are not the subject of these appeals concerned the redevelopment of the upper power site.

mately $50,000. Expenditures during the same period were over $1,000,000.[14] These expenditures were principally incurred in connection with the redevelopment of the upper power site. Raymond disagreed with the specifics of the plan to redevelop the upper power site and objected to the expenditure of large sums of money by Metals Selling while he was attempting to separate his ownership interests from Norman's.

The trial court determined that Norman had exercised supervision of Metals Selling during this period in a manner consistent with due care. In so concluding, the trial court found that Norman had retained experts in connection with the development by Metals Selling of the upper power site, that those experts had recommended a smaller project than had been contemplated by Raymond, and that Norman reasonably accepted that recommendation. Additionally, the trial court determined that development of the upper power site proceeded at a pace that was consistent with the pace achieved during Raymond's involvement in the management of Metals Selling, and that the project was completed within budget. The trial court concluded that Norman's actions during this period were protected from challenge under the business judgment rule, and were thus immunized from liability. The trial court further determined that Raymond had failed to demonstrate that Norman's conduct during the applicable period was so egregious as to constitute fraud or gross mismanagement inconsistent with normal business practices for similarly situated closely held corporations.

This is the first occasion that this court has had to determine the scope of the business judgment rule in

---

[14] Revenues for these expenditures were generated by liquidating a significant percentage of Metals Selling's inventory of unprocessed magnesium, grossing approximately $600,000.

Connecticut. Originating at common law, the rule has previously been construed under Connecticut law by the Second Circuit Court of Appeals; see *Joy* v. *North,* 692 F.2d 880, 884–86 (2d Cir. 1982), cert. denied sub nom. *Citytrust* v. *Joy,* 460 U.S. 1051, 103 S. Ct. 1498, 75 L. Ed. 2d 930 (1983); and has been codified in part in General Statutes § 33-313.[15] The business judgment rule insulates corporate directors[16] from liability for business decisions within the power of the corporation for which the directors have exercised due care.[17] H. Henn, Law of Corporations (2d Ed. 1970) § 242, p. 482.

[15] General Statutes § 33-313 (d) provides: *"A director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care as an ordinarily prudent person in a like position would use under similar circumstances.* In performing his duties, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, prepared or presented by (1) one or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented, (2) counsel, public accountants or other persons as to matters which the director reasonably believes to be within such person's professional or expert competence, or (3) a committee of the board upon which he does not serve, duly designated in accordance with a provision of the certificate of incorporation or the bylaws, as to matters within its designated authority, which committee the director reasonably believes to merit confidence, but he shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that causes such reliance to be unwarranted. *A person who performs his duties in accordance with this subsection shall be presumed to have no liability by reason of being or having been a director of the corporation."* (Emphasis added.)

[16] Although the business judgment rule is usually defined in terms of the role of corporate directors, it is equally applicable to corporate officers exercising their authority and is also applicable in certain instances to controlling shareholders when exercising their more extraordinary management functions. See H. Henn, Law of Corporations (2d Ed. 1970) § 242, p. 483. Although Norman was an officer, director and controlling shareholder of Metals Selling and Metalmast, it was the exercise of his discretion as a corporate officer of Metals Selling that gave rise to Raymond's claim of mismanagement and to which the business judgment rule applies in this instance.

[17] The American Law Institute Principles of Corporate Governance has stated the duty of care as follows: "(a) A director or officer has a duty to

"[T]he business judgment doctrine [is] a rule of law that insulates business decisions from most forms of review. Courts recognize that managers have both better information and better incentives than they. The press of market forces . . . will more effectively serve the interests of all participants than will an error-prone judicial process." *Kumpf* v. *Steinhaus,* 779 F.2d 1323, 1325 (7th Cir. 1985), citing *Joy* v. *North,* supra, 692

the corporation to perform the director's or officer's functions in good faith, in a manner that he or she reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances. This Subsection (a) is subject to the provisions of Subsection (c) (the business judgment rule) where applicable.

"(1) The duty in Subsection (a) includes the obligation to make, or cause to be made, an inquiry when, but only when, the circumstances would alert a reasonable director or officer to the need therefor. The extent of such inquiry shall be such as the director or officer reasonably believes to be necessary.

"(2) In performing any of his or her functions (including oversight functions), a director or officer is entitled to rely on materials and persons in accordance with §§ 4.02 and 4.03 (reliance on directors, officers, employees, experts, other persons, and committees of the board).

"(b) Except as otherwise provided by statute or by a standard of the corporation and subject to the board's ultimate responsibility for oversight, in performing its functions (including oversight functions), the board may delegate, formally or informally by course of conduct, any function (including the function of identifying matters requiring the attention of the board) to committees of the board or to directors, officers, employees, experts, or other persons; a director may rely on such committees and persons in fulfilling the duty under this Section with respect to any delegated function if the reliance is in accordance with §§ 4.02 and 4.03.

"(c) A director or officer who makes a business judgment in good faith fulfills the duty [of care] if the director or officer: (1) is not interested in the subject of the business judgment; (2) is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances; and (3) rationally believes that the business judgment is in the best interests of the corporation.

"(d) A person challenging the conduct of a director or officer under this Section has the burden of proving a breach of the duty of care, including the inapplicability of the provisions as to the fulfillment of duty under Subsection (b) or (c), and, in a damage action, the burden of proving that the breach was the legal cause of damage suffered by the corporation." 1 A.L.I., Principles of Corporate Governance (1994) § 4.01.

F.2d 885–87. The business judgment rule "expresses a sensible policy of judicial noninterference with business decisions made in circumstances free from serious conflicts of interest between management, which makes the decisions, and the corporation's shareholders. Not only do businessmen know more about business than judges do, but competition in the product and labor markets and in the market for corporate control[18] provides sufficient punishment for businessmen who commit more than their share of business mistakes." *Dynamics Corp. of America* v. *CTS Corp.*, 794 F.2d 250, 256 (7th Cir. 1986). "[T]he fact is that liability is rarely imposed upon corporate directors or officers simply for bad judgment and this reluctance to impose liability for unsuccessful business decisions has been doctrinally labeled the business judgment rule." *Joy* v. *North*, supra, 885. Shareholders challenging the wisdom of a business decision taken by management must overcome the business judgment rule.[19] *Kumpf*

---

[18] The market for corporate control serves to constrain managers' conduct that does not maximize shareholder wealth. It therefore serves to align the interests of managers more closely with the interests of shareholders in publicly traded corporations. The market for corporate control does not affect, however, the incentives of managers of closely held corporations. Protections for investors therein, as well as for investors in certain publicly traded corporations, are provided through negotiated terms in the certificate of incorporation, bylaws or other consensual arrangements among shareholders. When shareholders have not provided for such protection, they have limited remedies under the corporation law of the state of Connecticut, which is in effect a set of standard terms that courts will enforce absent explicitly agreed upon provisions among parties. See F. Easterbrook & D. Fischel, "Close Corporations and Agency Costs," 38 Stan. L. Rev. 271, 293 (1986).

[19] One of the principal advantages of the business judgment rule is that it limits the judicial role to enforcing contracts, a role with which courts have some familiarity, rather than writing contracts for parties, a role with which courts have no familiarity. Absent express provisions in the corporate documentation, which are not present in the case at hand, our courts will rely on the corporation law of Connecticut, which provides in the main a standard set of terms for shareholders who have not bothered to negoti-

v. *Steinhaus,* supra, 1325. "For efficiency reasons, corporate decision makers should be permitted to act decisively and with relative freedom from a judge's or jury's subsequent second questioning. It is desirable to encourage directors and officers to enter new markets, develop new products, innovate, and take other business risks." 1 A.L.I., Principles of Corporate Governance (1994) § 4.01 (c) comment, p. 174; see footnote 17.

Raymond claims that the trial court's application of the business judgment rule to Norman's conduct was clearly erroneous because Norman failed to exercise due care in his management of Metals Selling during the applicable period of Norman's control. These are factual claims. "Appellate review of fact bound rulings of the trial court is limited to a determination of whether there has been a clearly erroneous finding of fact." *Adriani* v. *Commission on Human Rights & Opportunities,* 228 Conn. 545, 548, 636 A.2d 1360 (1994); see also Practice Book § 4061.[20] "The resolution of conflicting factual claims falls within the province of the trial court." (Internal quotation marks omitted.) *Commissioner of Health Services* v. *Youth Challenge of Greater Hartford, Inc.,* 219 Conn. 657, 666, 594 A.2d 958 (1991).

---

ate their own terms. See generally F. Easterbrook & D. Fischel, "Close Corporations and Agency Costs," 38 Stan. L. Rev. 271 (1986).

[20] Practice Book § 4061 (formerly § 3030D) provides: "REVIEW BY THE COURT

"The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law.

"If the court deems it necessary to the proper disposition of the cause, it may remand the case for a further articulation of the basis of the trial court's factual findings or decision.

"It is the responsibility of the appellant to provide an adequate record for review."

There is ample evidence in the record that indicates that Norman exercised due care[21] in his management of Metals Selling. The trial court determined that Norman informed himself of material information reasonably available to him in his management of Metals Selling, and that in so doing he fulfilled his duty of care. The business judgment rule thus insulates Norman's management of Metals Selling from legal challenge. The trial court determined that Raymond had failed to show in accordance with the stipulation that Norman's conduct in connection with his management of Metals Selling was so egregious as to constitute " 'fraud . . . or gross mismanagement . . . inconsistent with normal business practices for similarly situated closely held corporations.' " The trial court determined that Norman was, therefore, insulated from liability by the business judgment rule. We have no reason to disturb that conclusion.

## B

Raymond next claims that the trial court erroneously determined that payment of the legal fees of the law firm in this litigation by Metals Selling and Metalmast was proper. He argues that the trial court's finding that the corporations were real defendants in this litigation and, therefore, entitled to representation was clearly erroneous. He also argues that the trial court erroneously applied the law of estoppel to the concession by the law firm that the corporations had no independent position in the litigation. We disagree.

The following additional facts are relevant to this claim. After the commencement of these four actions by Raymond, the law firm filed appearances in all four actions: for Norman in the derivative actions, in which

---

[21] Due care has been defined in General Statutes § 33-313 (d); see footnote 15; as the performance of duties "with such care as an ordinarily prudent person in a like position would use under similar circumstances."

the corporations were both plaintiffs and defendants, and for the corporations in the dissolution actions. Raymond objected to the law firm's representation of the corporations and moved to disqualify the firm, seeking independent representation for the corporations instead. His opposition was based on his desire not to subsidize Norman's defense with corporate moneys of which he was in effect a one-half owner. In opposition to that motion, Norman, through the law firm, conceded that the corporations were nominal parties in the litigation, the battleground for the dispute between the two brothers.[22] On the basis of that concession, Raymond withdrew his motion to disqualify, without prejudice to his right to raise in the trial court the amount or propriety of fees paid to the law firm.

At the evidentiary hearing in the trial court, Raymond challenged the propriety of the payment of the fees of the law firm by the corporations. The trial court determined that Norman had the requisite authority to retain counsel on behalf of the corporations, that the corporations had real interests in the litigation that required representation, and that they were entitled to representation of Norman's choosing.

This claim arises in the context of joint legal representation of related parties in a shareholder's derivative suit. The derivative suit is an action brought on behalf of a corporation by some percentage of its shareholders. *Ross* v. *Bernhard,* 396 U.S. 531, 538, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970). The corporation is in an anomalous position of being both a defendant and a

---

[22] Specifically, Norman maintained that "[t]he corporation is solely a nominal party which is not taking an active role in the litigation proceedings . . . . The reality of the situation is that the present litigation proceedings revolve around a dispute between two brothers . . . . The corporate entities have no independent position . . . . Raymond and Norman are the adversaries. The corporate entity, in the real world of this litigation, is simply a passive/nominal bystander, i.e., the battleground if you will."

plaintiff in the same action. This unusual posture for the corporation is the result of the historical evolution of the derivative suit. At common law, there was no action in law permitting a shareholder to call corporate managers to account. Id., 534. In equity, there were two actions that evolved into a single derivative action: in one action the corporation was named as a defendant in order to compel it to take action against its controlling officers; in the second, the shareholder maintained an action against the officers and directors of the corporation, on behalf of the corporation. The dual actions were cumbersome and evolved into the present day unitary derivative action.[23] Id.

The shareholder is often only a nominal plaintiff in a derivative action.[24] The purpose of the derivative action is to compel assertion of a corporate right of action against a corporation's directors or officers when the corporation, usually under the control of the defendant officers and directors, refuses to sue on its own behalf. See Cannon v. United States Acoustics Corp., 398 F. Sup. 209, 213, (N.D. Ill.), modified on other grounds, 532 F.2d 1118 (7th Cir. 1975).

In a derivative suit, the role of counsel for the corporation who is also counsel for the defendant directors can, under certain circumstances, be hampered by a conflict of interest.[25] Because the determination of

---

[23] For a historical analysis of the origins of the derivative suit, see Ross v. Bernhard, supra, 396 U.S. 531.

[24] In fact, in the context of the large publicly traded corporation, because the benefit to any individual shareholder in securing a recovery for the corporation may be correspondingly small, the party with the more significant interest on the plaintiff's side in a derivative suit often may be the plaintiff's counsel, who may stand to reap hefty fees in connection with a recovery or settlement. In this case, however, Raymond, whose immediate family controlled 50 percent of the stock of Metals Selling and Metalmast, had a real interest in securing a recovery for the corporations.

[25] The classic example of such a conflict of interest is a situation in which a lawyer is representing both a corporation that is likely to gain a signifi-

whether joint representation of a corporation and its directors creates a conflict requiring separate counsel inevitably turns on the facts of a particular case, that determination is left to the discretion of the trial court. The propriety of dual representation in a derivative action "must be determined in light of the particular facts attending each such case." (Internal quotation marks omitted.) *Hausman* v. *Buckley,* 299 F.2d 696, 699 (2d Cir.), cert. denied, 369 U.S. 885, 82 S. Ct. 1157, 8 L. Ed. 2d 289 (1962). Similarly, the determination of whether these two corporations were real parties in interest, entitled to representation, is within the discretion of the trial court.

"In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. *State* v. *Bitting,* 162 Conn. 1, 11, 291 A.2d 240 (1971); *E. M. Loew's Enterprises, Inc.* v. *Surabian,* 146 Conn. 608, 612, 153 A.2d 463 (1959). *Celanese Fiber, Division of Celanese of Canada, Ltd.* v. *Pic Yarns, Inc.,* [184 Conn. 461, 466–67, 440 A.2d 159 (1981)]." (Internal quotation marks omitted.) *Red Rooster Construction Co.* v. *River Associates, Inc.,* 224 Conn. 563, 575, 620 A.2d 118 (1993). "Such discretion, however, imports something more than leeway in decision making and should be exercised in conformity with the spirit of the law and should not impede or defeat the ends of substantial justice." (Internal quotation marks omitted.) Id.

In this case, the trial court did not abuse its discretion. It determined that the corporations had real interests at stake in the litigation that required the assistance of counsel. Those interests included the fact that the dissolution suits put the continued existence

cant recovery because of director fraud, and the controlling directors, if the corporation seeks to assert certain special defenses on behalf of the directors. See, e.g., *Carroll* v. *New York, N.H. & H. R. R.,* 141 F. Sup. 456 (D. Mass. 1956).

of the corporations in jeopardy. The retention of counsel, therefore, served a proper business purpose. The trial court noted that, under those circumstances, it may have been a breach of the duty of care for Norman to have failed to retain counsel for the corporations.

We are unpersuaded by Raymond's argument that the continued existence of a corporation cannot serve as a proper business purpose for the retention of counsel because the dissolution of a deadlocked corporation is mandatory under § 33-382 (a) (2). Retention of counsel is an ex ante proposition: a corporation cannot be precluded from retaining counsel at the outset because it may, in the end, face dissolution. Regardless of the ultimate disposition of the case, the corporation may wish to dispute allegations or otherwise mount a defense. We are unwilling to promulgate so broad a rule as Raymond suggests.

Raymond's argument that Norman is estopped from maintaining that the corporations had an independent position from Norman's own is misplaced. It is true that, in response to Raymond's motion to disqualify the law firm from representing the corporations, the law firm conceded that the corporations did not have an independent position from Norman's. Norman was not precluded, in response to Raymond's effort to preclude the corporations from paying the law firm's fees, from arguing that the corporations had real interests in the litigation. When Raymond withdrew his motion to disqualify the law firm, but retained the option of later challenging the propriety of the payment of its legal fees by the corporations, he implicitly left open the door for Norman to assert that there were real corporate interests at stake that justified the retention of counsel for the corporations. Successful assertion of the doctrine of equitable estoppel requires proof of two elements: (1) a statement or action by the party against

whom estoppel is claimed designed to induce reliance on that statement or action; and (2) a changed position by the second party in reliance on the act or statement of the first that results in loss or injury to the second party. See *Lunn* v. *Tokeneke Assn., Inc.,* 227 Conn. 601, 607, 630 A.2d 1335 (1993). "For estoppel to exist, there must be misleading conduct resulting in prejudice to the other party." Id.; *John F. Epina Realty, Inc.* v. *Space Realty, Inc.,* 194 Conn. 71, 85, 480 A.2d 499 (1984).

Because Raymond could not have relied on a representation made by Norman in connection with a motion to disqualify for purposes of challenging the payment of corporate legal fees, he has failed to meet the first element of the two part test for equitable estoppel. We therefore reject his claim.

C

Raymond next claims that the trial court improperly determined that Norman had not engaged in self-dealing transactions voidable under General Statutes § 33-323[26] by increasing the pay of his son, Paul, and

[26] General Statutes § 33-323 provides in relevant part: "CORPORATE TRANSACTIONS WITH DIRECTORS AND OTHERS. (a) A contract or transaction between a corporation and a director thereof or a member of his immediate family, or between a corporation and any other corporation, firm or other organization in which a director of the corporation and members of his immediate family have an interest, shall not be voidable, and such director shall not incur any liability, merely because such director is a party thereto or because of such family relationship or interest, if: (1) Such family relationship or such interest, if it is a substantial interest, is fully disclosed, and the contract or transaction is not unfair as to the corporation and is authorized by (i) directors or other persons who have no substantial interest in such contract or transaction in such a manner as to be effective without the vote, assent or presence of the director concerned or (ii) the written consent of all of the directors who have no substantial interest in such contract or transaction, whether or not such directors constitute a quorum of the board of directors; or (2) such family relationship or such interest, if it is a substantial interest, is fully disclosed, and the contract or transaction is approved by the affirmative vote of the holders of a majority of the

by directing Metalmast to increase rental payments it was making to Norman for the use by Metalmast of certain real property owned by him. Raymond argues that the trial court improperly allocated the burden of proof of demonstrating that the alleged self-dealing was fair, in good faith and for adequate consideration, by

voting power of the shares entitled to vote thereon; or (3) the contract or transaction is not with the director or a member of his immediate family and any such interest is not substantial, subject, however, to the provisions of subsection (b) of this section; or (4) the contract or transaction is fair as to the corporation.

"(b) Subject to the provisions of subsection (a) of this section, a contract or transaction between two corporations with one or more common directors or officers shall not be voidable by a corporation, a party thereto or by a person succeeding to, or otherwise entitled to exercise, the right of the corporation merely because of such relationship, if: (1) The contract or transaction is not manifestly unfair as to such corporation; or (2) the contract or transaction is approved by the affirmative vote of the holders of a majority of the voting power of the shares entitled to vote thereon of such corporation.

"(c) No contract or transaction shall be voidable merely because a director of a corporation is a party thereto, or because of any relationship or interest of the type described in subsections (a) and (b) of this section, except by such corporation, if a party thereto, or by a person succeeding to, or otherwise entitled to exercise, the right of any such corporation. In any proceeding to void such contract or transaction, the court may, if it deems it equitable, rescind the contract or transaction in whole or in part, or award damages, or both, but the rights of third parties shall be protected.

"(d) For the purposes of this section: (1) 'Member of the immediate family' means spouse, parents and children; (2) 'substantial interest' shall exclude: (i) The interest of a person in a corporation, firm or other organization as a debt or equity holder therein where the debt or equity held is less than ten per cent of the outstanding debt or equity, as the case may be, of such corporation, firm or other organization; (ii) the interest of a person in a corporation, firm or other organization by reason of being a director, officer or employee, or their equivalents, thereof; (iii) the interest of a director of a corporation or a member of his immediate family in another corporation, firm or other organization which arises by reason of the fact that the corporation has a debt or equity interest in such other corporation, firm or other organization; (3) any contract or transaction between a corporation and a person, corporation, firm or other organization made in the ordinary course of business at standard prices or on terms not less favorable to the corporation than those offered by the person, corporation, firm or other organization to others, shall be prima facie fair."

requiring that he, rather than Norman, bear that burden. Although we agree that the trial court incorrectly determined that Norman's conduct did not constitute self-dealing, we also conclude that the trial court's error was rendered harmless by means of an alternate conclusion.

The following facts are relevant to this claim. Paul's salary was periodically raised by Norman from a base of $600 per week in 1984 to $1000 per week in 1987. Paul was also given a cash bonus of $20,000 in 1988. Neither these raises nor the bonus was approved by the board of directors or the shareholders of Metalmast.

As noted above, after acquiring Raymond's one-half interest in the real property on which Metalmast and Metals Selling conducted the bulk of their operations, Norman directed Metals Selling to pay him the $5000 per month in rent that it had been previously paying to Metalmast as a subtenant on the property. Norman was also receiving $4000 per month in rent from Metalmast. Norman's action had the effect of increasing the aggregate rental payment he received on the property from $4000 per month to $9000 per month. It also diminished the revenues of Metalmast by $5000 per month. The trial court concluded that the fair market rent for the property was $10,000 per month. Raymond claimed that the unilateral decision by Norman to alter the terms of the rental arrangements between the tenants and the owners of the real property, by providing for payment by the subtenant directly to him rather than to the corporate tenant, constituted voidable self-dealing.

Ordinarily, business decisions made by officers and directors of corporations with the exercise of due care are insulated from challenge by the business judgment rule. Transactions made by a corporation with officers, directors or certain members of their immediate family,

however, are subject to heightened scrutiny. At common law, such transactions were voidable by the corporation as self-dealing. H. Henn, supra, § 238. Section 33-323 provides a safe harbor for certain of these transactions by eliminating voidability for self-dealing transactions that meet certain requirements. These requirements include approval of the contract or transaction by shareholders or disinterested directors, or fairness to the corporation. See footnote 26. If a plaintiff can demonstrate that a transaction is self-dealing, the burden shifts to the defendant officer or director wishing to take advantage of the safe harbor provisions of § 33-323 to demonstrate that the self-dealing transaction was completed in accordance with its provisions. See *Hadden* v. *Krevit,* 186 Conn. 587, 590, 442 A.2d 944 (1982).

Raymond argues that the trial court's determination that these transactions were not self-dealing by Norman is clearly erroneous. We agree. At common law, transactions by the corporation with an officer or with members of his immediate family were self-dealing.[27] Those transactions were voidable by the corporation under certain circumstances. In this case, the transaction between the corporation and the son of its president, and the rental of space by the corporation from its president, are examples of common law self-dealing.

Notwithstanding the trial court's improper determination that the transactions were not self-dealing, it

---

[27] Raymond's reliance on General Statutes § 33-323 for the proposition that transactions between a corporation and its officers or their immediate family are voidable is misplaced. That statute delineates a safe harbor, eliminating voidability as a remedy for self-dealing transactions meeting certain requirements. The statute is not a codification of the common law rule that self-dealing transactions were voidable by the corporation under certain circumstances. In effect, the statute implicitly incorporates the common law principle of voidability of self-dealing transactions, but modifies that principle by providing a safe harbor for transactions that meet the statutory terms.

also determined that the transactions were not unreasonable in the context in which they were made. This determination was supported by substantial evidence in the record. This evidence included references to an accountant's determinations made in connection with the auditor's report that the increase in salary and bonus paid to Paul was an unexceptional decision made in the ordinary course of business and was in keeping with past compensation practices at the two corporations. The court also reviewed extensive documentation concerning the use of the rental property, and the costs of comparable properties. It concluded that the rent that was charged by Norman to the two corporations was below fair market value.

Section 33-323 (a) (4) provides that a contract or transaction between the corporation and an officer or a member of his immediate family shall not be voidable if "the contract or transaction is fair as to the corporation." See footnote 26. Because the trial court determined, on the basis of sufficient evidence, that the transactions complained of were fair as to the corporation, its improper determination that the transactions were not self-dealing is harmless. A trial court may err in a conclusion and render that error harmless by an alternative conclusion. *Lavigne* v. *Lavigne*, 3 Conn. App. 423, 425, 488 A.2d 1290 (1985). Accordingly, we reject Raymond's claim.[28]

D

Raymond's final claim is that the trial court improperly failed to hold Norman liable for appraisal costs in

---

[28] Raymond also argues that the trial court misapplied the burden of demonstrating lack of reasonableness of the self-dealing transactions to him rather than the reasonableness of the transactions to Norman. Because the trial court determined that the transactions were not self-dealing, it was not necessary for Norman to demonstrate that the self-dealing fell within one of the safe harbor provisions of General Statutes § 33-323. Raymond's argument in this instance is therefore inapplicable to the circumstances of this appeal.

connection with the dissolution actions. Raymond argues that the terms of General Statutes § 33-384[29] establish a statutory formula for taxing appraisal costs, and that the trial court improperly determined that he had, pursuant to the stipulation, waived his right to these costs. We disagree.

The language of the stipulation established a method, distinct from that contemplated by § 33-384, for apportioning costs in connection with the liquidation of the companies. Specifically, the stipulation provided a mechanism under which each brother was given an opportunity to purchase the other's interest. The stipulation also provided that if neither brother elected to purchase the other's interest, the court was to liquidate the assets of the corporations in a manner deemed appropriate by the court, and provided further that the fees of the auditor be paid by the corporations.

[29] General Statutes § 33-384 provides in relevant part: "APPLICATION BY SHAREHOLDER FOR APPRAISAL OF PETITIONER'S SHARES. (a) Whenever a petition for judicial winding up is filed by a shareholder or shareholders as provided in section 33-382, hereinafter in this section referred to as 'petitioner,' any other shareholder may at any time within sixty days after the filing of such petition, or at such later time as the court in its discretion may allow, apply to the court to have the fair value of the petitioner's shares appraised.

"(b) The court shall thereupon by its judgment determine the fair value of the petition's shares as of the day prior to the date on which such petition was filed, exclusive of any element of value arising from such filing. It may, if it so elects, appoint one or more persons as appraisers to receive evidence and recommend a decision on the question of fair value. The appraisers shall have such power and authority as shall be specified in the order of their appointment or an amendment thereof.

"(c) Within ten days after written notice from the clerk of the court that such appraisal has been filed, the applicant shall file with the court a signed statement stating whether he elects to buy the petitioner's shares at the appraisal. If he does elect to buy them, he shall at the time of filing such statement deposit the amount of such appraisal in cash, or certified check, with the clerk of the court.

"(d) If deposit is made as provided in subsection (c), an order of sale shall be entered directing the petitioner forthwith to turn over his share certificates to the court for delivery to such applicant, or his nominee. The deposit

The interpretation of the stipulation was within the sound discretion of the trial court. The trial court determined that by entering into the stipulation, subsequent to the refusal by both brothers to purchase the other's shares pursuant to the appraisal, each had implicitly waived the statutory formula for taxing costs and had expressly provided instead that the corporations bear those costs. That finding is supported by adequate evidence.

The judgment is affirmed.

In this opinion the other justices concurred.

shall be paid over to the petitioner by the clerk on receipt of the certificates representing such shares, duly endorsed for transfer. Upon entry of such order of sale, the petitioner shall no longer be a shareholder of the corporation except for purposes of appeal therefrom and, upon motion of the applicant, the petition or judicial winding up proceeding shall be dismissed and such other orders entered continuing the corporation as the court may direct. The court may direct that notice of such dismissal be given to such interested persons as it deems proper and may take all such reasonable action as it deems proper to provide fair opportunity for shareholders desiring to continue the corporation to purchase the shares of shareholders desiring to dissolve the corporation, and fair opportunity for the latter to sell their shares to the former, at the appraised fair value thereof.

"(e) If the applicant fails to make the deposit as provided in subsection (c), the proceeding shall proceed in due course. If the applicant fails to make the deposit, no other shareholder may proceed as applicant as provided in subsection (a), but the court may, in its discretion, in the course of the proceedings, permit other shareholders to make deposit as provided in subsection (c) and in such case shall proceed as provided in subsection (d).

"(f) The expenses of the appraisal shall be taxed by the court and shall be paid by the applicant if he fails to make the deposit as provided in subsection (c), but otherwise shall be taxed against the corporation and added to the final costs in the action."