[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
PROCEDURAL HISTORY
These are two files consolidated for trial. The first is the lawsuit of the plaintiff Thomas Cribbin, to whom this memorandum shall consistently refer as "plaintiff," against Allied Color, Inc., the "defendant." The plaintiff claims the defendant breached a contact to pay a certain sum for the plaintiff's shares of Allied Color, Inc.
The second lawsuit, in which Allied Color, Inc. is suing both Cribbin and a partnership of which he was a general partner,[1] is one for breach of fiduciary duty and other tortious conduct arising from a claim that Cribbin and his partnership hid certain charges and overcharged for certain services that the partnership performed for Allied while Cribbin was an officer and director of Allied.
The first action started as an application for prejudgment remedy which, by stipulation of the parties, the court consolidated with the second action, and tried on the merits. The result of this cooperation by counsel with each other and with the court is that the two matters, commenced at the beginning of the year have reached resolution by court decision on the merits within ten months. CT Page 12441
FINDINGS REGARDING THE PLAINTIFF'S COMPLAINT
From March 1987 to July 1997, the plaintiff Thomas Cribbin was the president of the defendant Allied Color, Inc. The defendant had its principal place of business in Guilford, Connecticut. The defendant supplied color separation and preprint services to businesses such as publishing companies and advertising agencies. In 1992, the company had annual gross sales of $7 million, and carried a debt of between $3.5 and $4 million.
In September of 1992, certain mergers occurred and the company was reorganized. At the same time, some of the debt was refinanced, funded by a $1.9 million loan from Fleet Bank. The plaintiff, who had for some time been interested in acquiring an equity position in the company, became a 25% shareholder, acquiring 250 shares of the defendant as part of this transaction. The plaintiff guaranteed 25% of this new debt. Another employee of Allied, Paul McConville, acquired 10% of the shares at the same time.
Allied's majority shareholder was a holding company controlled by Patrick Leamy, a resident of Ireland, which held 65% of Allied's stock. The defendant was one of a number of companies owned by a group of investors headed by Leamy. During all relevant times, Leamy was entitled to vote the entire block of controlling shares.
The plaintiff as President and as a director of Allied exercised control over the day-to-day, affairs of Allied. Originally a protegee of Mr. Leamy and himself of Irish background, the plaintiff resided in Madison, near the site of the company in Guilford. He reported regularly to Leamy, with frequent transatlantic telefaxing of financial documents.
Mr. Leamy traveled to the United States two or three times a year to oversee his investment in Allied. In addition to entrusting the hands-on management of Allied to Mr. Cribbin, Mr. Leamy employed accountants and business advisors through his companies Perigord Communications and Tibet Investments to review the financial records that were regularly sent to him. Allied paid a sizable annual management fee to Tibet Investments.
As part of the loan agreement with Fleet, Allied agreed to certain restrictions on borrowing and on property acquisition. CT Page 12442 These restrictions made it necessary for Allied to lease rather than purchase certain pieces of equipment, such as computers and vehicles.
In 1992, the plaintiff and Paul McConville, who was then a vice-president of Allied, formed a partnership called Orwell Leasing Associates. The purpose of the partnership was to purchase items of equipment they knew that Allied could use and to lease these items to Allied. Because Cribbin and McConville were officers and directors of the company, Cribbin consulted with Leamy about the propriety of Orwell doing business with Allied before the first equipment lease was signed. Leamy indicated that he had no problem with the concept and that he did not object to "the lads making a dollar" through this modest side enterprise. This arrangement to lease equipment from Orwell was never the subject of a Board of Directors resolution. It was however duly reported in the yearly audited financial statement transmitted to all shareholders, officers and directors. The cost of each equipment lease paid out by Allied was contained in the copies of Allied's books that were faxed to Mr. Leamy and his financial advisors in Ireland each month. All of the leases were in writing and a copy kept in Allied's offices. Beginning in 1992 with the fiscal year ending September 1993, the accountants in charge of the audit — T.M. Byxbee Company — noted in the audited financial statements that these related-party transactions existed.[2]
Between 1992 and 1996, the industry of which Allied was a part experienced a downturn. Nearly half of comparable businesses closed during this period. From 1994 to 1996, Allied experienced a loss each year. Leamy became dissatisfied with the company's performance during this time and undertook various actions to deal with the losses.
In December 1995, Seamus Lonergan, a consultant to Mr. Leamy, was installed at Allied to advise about the company's finances, particularly the more efficient recovery of receivables. The plaintiff accepted a sizable reduction in salary. The management fee to the Leamy investment company was suspended.
In October 1996 McConville resigned from Allied and sold back his remaining shares at the negotiated price of $700 per share, payable over time. Simultaneously McConville resigned as a partner in Orwell. Meanwhile the plaintiff remained optimistic about Allied and thought that if he could control the company and CT Page 12443 once again reorganize its debt he could turn it around. Patrick Leamy and the plaintiff began earnest discussions about the plaintiff purchasing the company.
The plaintiff arranged for a second restructuring of the company debt with a new loan through the Small Business Administration with First National Bank of New England for $935,000 which the plaintiff personally guaranteed. Next Cribbin and Leamy agreed in writing that Leamy would consent to sell the plaintiff all of the outstanding shares of Allied at a price of $700 per share. To purchase these shares the plaintiff arranged to acquire additional funds from private sources, one of whom was Lonergan who was interested in becoming partners with Cribbin in the deal and who believed he could help raise $70,000 of the remaining $250,000 necessary to close on the stock purchase.
But the plaintiff had trouble putting together the cash to buy the shares by April 30, 1997, the drop-dead date in the share purchase agreement. The plaintiff and Leamy, whose relationship had become somewhat adversarial, arranged a meeting on May 23, 1997. Frustrated by the plaintiffs inability to close, and realizing that they could no longer cooperate as co-owners of the company, Leamy offered to buy out the plaintiff instead of the reverse.
A new agreement — a simple, two-page contract — was quickly reached, written and signed. The contract obligated Allied to pay the plaintiff $700 per share for a total of $175,000. Within a few weeks thereafter the parties renegotiated the agreement to provide that the plaintiff was obligated to resign as an employee, director and officer; to agree to employment restrictions for a nine-month period; and to terminate the Orwell equipment leases for a one-time payment from Allied of $15,000. The plaintiff further agreed to accept the $175,000 payment over a 39-week period, at $3205.13 for 39 weeks beginning July 7, 1997, with a lump-sum payment of $50,000 in week 39.[3]
Allied agreed "to use its best efforts and every reasonable effort" to obtain a release of the plaintiff's personal guaranty on the loan from First National Bank of New England. Allied further agreed to provide health insurance for the plaintiff and his family during the 39-week stock redemption period and to reimburse previously unpaid business expenses. This renegotiated agreement was dated July 3, 1997, and signed by Allied and by the plaintiff. CT Page 12444
The plaintiff fully complied with his obligations under the agreement. The defendant however attempted to renegotiate the terms of the agreement yet again. By letter to plaintiff of September 26, 1997, Allied cited lender reticence as a reason to propose restructuring the payment schedule from $3205.13 per week to $1000 per week. A second nearly identical proposal followed on October 16, 1998.[4] The plaintiff rejected both proposals and insisted that Allied comply with the previous contract. When Allied refused to make further payments, Cribbin sued.
ADDITIONAL FINDINGS REGARDING DEFENDANTS COMPLAINT ANDSPECIAL DEFENSES
The defendant filed a nine-count special defense and counterclaim in the first case and a duplicate nine-count complaint in the second case in which the corporation is the plaintiff and Cribbin and Orwell Leasing Associates are the defendants. (For consistency, however, this memorandum will continue to refer to Cribbin as the plaintiff and Allied as the defendant.) The complaint of Allied alleges that Cribbin, in league with Orwell, is liable for (Count 1) breach of fiduciary duty, (Count 2) breach of good faith and fair dealing, (Count 3) misappropriation of corporate opportunity, and (Count 4) conversion.[5]
The allegations of the defendant center on three sets of transactions. The first is the Orwell leases, which from 1993 through 1997, involved some printing and small computer equipment that Orwell purchased and then leased to Allied. Allied claims that it could have gotten similar equipment at a better lease rate, and that the plaintiff was under a duty to disclose this fact to Allied and ought not to have profited as an Orwell partner from this arrangement.
The next transaction giving rise to the defendants claims is Allied's acquisition of a Kodak proofer, that also involved contractual commitments to Orwell. The defendant alleges that there was not adequate disclosure to the corporation of the benefits to the plaintiff in this deal, and that the payments to Orwell were for inadequate consideration and were patently unfair to Allied.
Finally the defendant claims that the plaintiff as an Orwell partner should not have bought the two company cars Allied had CT Page 12445 previously leased from Hoffman Lexus and from Volvo City that were used by Mr. McConville and the plaintiff when they were company executives. Rather the plaintiff should have allowed Allied to exercise the buy-out option and thus own the cars outright, or should have negotiated a lower lease rate for the pre-owned cars.
THE ORWELL EQUIPMENT LEASES
First, as to the Orwell equipment leases, much of the evidence centered on the value of the leases to Orwell and how much money Allied could have saved if it had obtained these few pieces of office equipment from other leasing companies rather than from Orwell. But this must be seen through the perspective of what was disclosed and intended at the time rather than what the defendant now construes as pernicious through hindsight. Mr. Leamy, the principle investor, and his associates, were all fully aware of the Orwell leases. There is no dispute that the entire concept of Orwell Leasing Associates doing business with Allied was discussed ahead of time and personally approved by Mr. Leamy. It was the intention of Leamy and of Allied to allow this leasing operation to exist as a perquisite to the plaintiff (and to Mr. McConville while he was a director and shareholder). Although most of the equipment could in fact have been leased or purchased at a better rate elsewhere, there has been no showing that the Orwell leases significantly disadvantaged the defendant. Indeed they represent a minuscule percentage of the company's expense.
Moreover the cost of the leases was faithfully reported each month in the financial statements that were faxed regularly to Mr. Leamy and his associates in Ireland; the books of Allied were fully open to and were regularly examined by Mr. Leamy's designees. The leases themselves were kept at Allied's offices, available for inspection. In fact Mr. Leamy and his designees were fully aware of the leases and the sweetheart arrangement with Orwell. Only once the relationship between Leamy and Cribbin had, in a sense, broken down irretrievably did Allied and Leamy begin to analyze how sweet these leases were to Orwell and to use this arrangement as an excuse to claim malfeasance by Cribbin. The court finds no merit to the claim that Allied suffered any loss as a result of allowing its president and minority shareholder, the plaintiff, from profiting in a modest way from the Orwell/Allied business dealings.
THE KODAK "PROOFER"
CT Page 12446
In July 1994, Allied entered into a contract with the Pitman Company (no relation to the undersigned), one of Allieds primary suppliers of paper, film, and other materials, and with Eastman Kodak Company, a major manufacturer of innovative imaging equipment. The object of this contract from the perspective of Allied was to obtain the use of a highly efficient and sophisticated proofing engine which fully interfaced with computers.
Allied would have use of the machine for its own business and could also produce images for demonstration purposes to other potential customers of Pitman and Kodak. Pitman Company would continue to own the machine and the software, and would make it available to Allied at no charge, provided Allied purchased exclusively from Pitman all of the Kodak supplies for the machine at a minimum of $850,000 per year. Allied, which already had a rebate deal with Pitman, got an increase in its rebate rate from 14% to 20% on its supply purchases under the new contract. Kodak, which manufactured the necessary supplies, would provide tech support under this same arrangement at no additional charge. This deal, which included a provision that title to the proofer would be transferred to Allied without any additional payment at the end of the five-year lease term, was highly beneficial to the three parties. The Allied Board of Directors approved of the lease arrangement in a special meeting held by teleconference on June 10, 1994.
The problem is that there was a side deal that was not in the written lease agreement between Allied, Pitman, and Kodak. As part of the consideration, the plaintiff agreed to endorse the new proofer to the trade, by attending shows and seminars and by producing demonstration images using the supplies and personnel at Allied. The plaintiff considered himself to be acting not just as Allied president for this side venture but also as an Orwell partner, providing "consulting services" to Allied under the Kodak lease. Thus the plaintiff arranged for Allied to pay Orwell $5000 per month for these services in connection with the lease of the Kodak proofer. But Orwell did not own the proofer and performed no services to Allied in connection with the proofer that are discernible from the evidence.
THE CAR LEASES
In July of 1992, Allied leased a 1992 Lexus for the use of CT Page 12447 the plaintiff; and in December 1992, Allied leased a 1993 Volvo 964 for the use of McConville. The lessors were Hoffman Lexus, and Volvo City Milford, respectively. Each lease was for a period of three years with a purchase option, fixed in each contract, at the end of the term. There is no reliable indication of what the actual purchase price of the car might have been at the time each was leased or of what the fair market value of the cars were at any point.[6] The cost of the end-of-lease purchase of the Lexus was $24,598.80, and that of the Volvo was determined by a formula based on a percentage of $16,410.
At the time of exercising the option to purchase, Allied, which provided automobiles to senior management as a perquisite, had to determine whether to purchase these cars, mindful of the restriction on property acquisitions and increased debt, or whether to enter into some kind of new lease for vehicles. The plaintiff determined that Orwell should exercise the buyout option, and, as it had done with other equipment, lease the cars to Allied at the same monthly rate as before.
The defendant contends that this was patently unfair to the company because the cars had depreciated and were not worth the same monthly rate as before. Although this argument has some common sense appeal, there was no evidence of what the fair cost to the company would have been to lease a newer car, nor to lease a car of the same age and condition as those which the plaintiff and McConville continued to use.
THE LAW GOVERNING CORPORATE FIDUCIARIES
Connecticut enacted the Connecticut Business Corporation Act ["new act"] effective January 1, 1997. This act reorganized and simplified the prior law. It did not substantially change the substance of prior law governing the conduct of corporate officers and directors in related-party transactions, called "directors' conflicting interest transactions" under the new act, Conn. Gen. Stat. § 33-781 to 33-784. Since virtually all of the conduct of which the defendant complains occurred before January 1, 1997, the court will refer in citations to the prior statutes.
There is no dispute that the plaintiff was a corporate fiduciary in relation to Allied. As a director during all relevant times, the plaintiff was obligated to comply with Conn. Gen. Stat. § 33-313(d) [new act § 33-756]: CT Page 12448
 A director shall perform his duties as a director . . . in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care as an ordinarily prudent person in a like position would use under similar circumstances.
Compliance with that duty normally insulates a director from liability for the decisions made within that authority on behalf of the corporation. "[L]iability is rarely imposed upon corporate directors or officers for bad judgment and this reluctance to impose liability for unsuccessful business decisions has been doctrinally labeled the business judgment rule." Joy v. North, 692 F.2d 880, 885 (2d Cir. 1982), cert. den. sub nom. Citytrust v. Joy, 460 U.S. 1051, 103 S.Ct. 1498,75 L.Ed.2d 930 (1983).
The insulation from liability provided by the business judgment rule does not apply if the director or officer has an interest in the subject of the business judgment. Rosenfield v.Metals Selling Corp., 229 Conn. 771, 796-97 (1994). See also 1 American Law Institute, Principles of Corporate Governance (1994) § 4.01(c). Because the plaintiff as one of two partners in Orwell Leasing Associates clearly had an interest in each of the transactions challenged by the defendant, the business judgment rule does not apply.
Rather, the court must look to the statute that governs transactions between a corporation and a director of that corporation, Conn. Gen. Stat. § 33-323 [new act §§33-782 and 33-783]. In such a transaction, the corporation is entitled to sue to void the transaction or to recover damages, or both. Sec. 33-323(c) [new act 33-782(b)]. A director can avoid liability for such a related party transaction if it is shown that his interest, "if it is a substantial interest, is fully disclosed and the contract or transaction is not unfair to the corporation and is authorized . . ." by other directors who have no interest at stake or by affirmative vote of those holding a majority of the voting shares of the corporation. Conn. Gen. Stat. § 33-323(a)(1) and (2). Otherwise liability can be avoided either by a showing that the interest of the director is not substantial, Sec. 33-323(a)(3), or by showing that the transaction, regardless of the director's interest, is fair as to the corporation. Sec. 33-323(a)(4). These provisions are often referred to as "safe harbor" CT Page 12449 provisions.
If the substantive standards for evaluating the related-party transaction were not already complex, the procedural standards make it more so. If the corporation can demonstrate that a transaction involves self-dealing, the burden shifts to the director to demonstrate that the self-dealing transaction was completed in accordance with the safe harbor provisions of Sec. 33-323 [new act §§ 33-782 and 33-783]. Rosenfield, 797. Furthermore, the director, as a corporate fiduciary, must prove fair dealing by clear and convincing evidence. KonoverDevelopment Corp v. Zeller, 228 Conn. 206, 229-30 (1994); OakhillAssociates v. D'Amato, 228 Conn. 723, 726-27 (1994).
In the first count, Allied alleges that in all of the disputed transactions, Cribbin structured them in such a way as to provide the maximum benefit for himself and Orwell at the expense, both figuratively and literally, of Allied, and thus breached his fiduciary duty to the corporation.
In the second count, the defendant alleges that Cribbin and Orwell breached their obligation to act in good faith and with fair dealing toward Allied. The factual allegations are the same as those in the previous count. Normally a breach of good faith can be asserted in an action for breach of contract in which it is asserted that a contract contains an implied covenant of good faith and fair dealing. See Conn. Gen. Stat. § 42a-1-203. There are no allegations to that affect here. The court reads this, in the absence of any further explication by the defendant, as simply a duplication in slightly different language of the legal theory in Count 1.
In the third count, the claim is one for usurpation of corporate opportunity. This requires essentially the same analysis as that in the first count since the tort of usurpation of corporate opportunity is really only another form of self-dealing. The recent case of Ostrowski v. Avery, 243 Conn. 355
(1997), is instructive on the burden of proof, the quantum of proof, and the elements necessary for the court to find breach of corporate fiduciary duty by an officer or director by usurpation of a business opportunity that belonged to the corporation.
First the corporation must show that the individual is a corporate fiduciary, a fact that is undisputed here. Then the burden remains on the corporation to show that a corporate CT Page 12450 opportunity existed, the determination of which is a factual question to be decided by reasonable inferences from objective facts. Id., 365. If such an opportunity was presented to the corporation through an officer or director who took advantage of the opportunity, the burden then shifts to the individual to justify his conduct by clear and convincing evidence.
In the fourth count the defendant alleges conversion. The only new facts alleged are that the plaintiff allocated to himself about $1500 per month in business expenses, and that this, together with the payouts for the Orwell leases, the Kodak proofer, and the automobile transactions, constitutes conversion. As before, the court understands this to be a claim of a breach of fiduciary duty, couched in other language.
The court notes, however, that it finds no credible evidence to support the allegation that the plaintiff wrongfully allocated to himself any funds for business expenses. The proof fails as to this issue.
LIABILITY OF CRIBBIN ON THE ORWELL LEASES AND CAR BUYOUT
The court finds the testimony of the plaintiff fully credible on the circumstances under which Orwell began to do business with Allied. Mr. Leamy, who was the authorized representative of the holding company that owned all the other shares of Allied besides those held by Cribbin and McConville, consented to the Allied/Orwell business relationship. The Orwell lease transactions as related party transactions were fully disclosed in the financial statements of the corporation. The amount Allied was paying each month for each piece of equipment was well documented and reported on a monthly basis.
Moreover the lease expense was very small in relation to the size of the corporation. Andrew Scanlon, a chartered accountant and advisor to Mr. Leamy, regularly reviewed the reports and considered the amount paid out for the equipment leases to be insignificant given the finances of the corporation. While it is true that by taking the time, effort, and expense of shopping around, the corporation could likely have found a better financial package on each piece of leased equipment, that single fact does not persuade the court that the Orwell lease arrangement was unfair to the corporation.
In Rosenfield v. Metals Selling Corp., supra, the Supreme CT Page 12451 Court did not disturb the trial courts finding that certain related-party transactions were not unreasonable in the context in which they were made. One factor influencing the court's finding, approved on appeal, was that a salary increase and bonus to a director's family member "was an unexceptional decision made in the ordinary course of business and was in keeping with past compensation practices at the [business]." Id., 798.
Likewise this court finds the lease of Orwell equipment such an unexceptional decision. Even though the business judgment rule does not apply in the case of a related-party transaction, the court must still be allowed to view relatively insignificant and unimportant financial transactions through the perspective of the whole corporate financial picture in determining its fairness to the corporation. The Connecticut Business Corporation Act [new act] makes it clear that the transaction must be judged "according to the circumstances at the time of the commitment." Conn. Gen. Stat. § 33-782(b)(3) [new act]. Viewed in that perspective, the court finds the lease transactions fair to the corporation. The court finds that Cribbin has sufficiently proved all of the elements of Conn. Gen. Stat. § 33-323(a)(1)(i) and 33-323(a)(4).
The court finds the same to be true regarding the cars. The court credits the plaintiff's testimony that it was his impression that Allied was prohibited by its major lender from increasing its debt and buying property. At the end of the car leases, Allied had to sign new leases with some other entity to continue to provide transportation as it always had for senior management personnel. Whether the decision to continue to drive a four-year-old car without calculating the depreciation and renegotiating a car lease is an attempt by the corporate fiduciary to take advantage of his position remains a question of fact for the court to determine in context. The decision to let Orwell buy the cars, and lease them back to Allied under the same terms as before, was not an unreasonable one nor was it unfair to the corporation. The plaintiff has carried his burden and established that the transaction was fair as to the corporation. Conn. Gen. Stat. § 33-323(a)(4).
The court finds that neither the Orwell equipment leases nor the car leases meets the definition of corporate opportunity delineated in Ostrowski, supra. In Ostrowski, the corporate fiduciary formed a business that manufactured the same kind ofproduct as the primary corporation and was essentially in CT Page 12452 competition for customers with it. Here Allied of necessity had to contract with some other entity to lease or buy items used in its business. This kind of transaction is not a business opportunity, at least not in this situation. Because the court finds that the corporation has failed to prove that Orwell's acquisition of the cars and equipment and its lease of the items to Allied was a corporate opportunity for Allied at all, Cribbin has no burden to justify these transactions under this theory.
LIABILITY OF CRIBBIN FOR THE KODAK LEASE
The defendant has attempted to characterize the lease of the Kodak proofer as a corporate opportunity usurped by the plaintiff. The documents demonstrate that while this was a corporate opportunity, there was no usurpation. Allied entered into the contact with Pitman Company and Eastman Kodak and got the benefit of that which is contained in the lease agreement, including the right of ownership of the proofer without any additional payment at the end of the five-year lease term.
However, Cribbin failed to fully disclose all of the details of the Kodak transaction to the nonconflicted director, Mr. Leamy. In fact, the document demonstrate that Cribbin and Orwell actively mislead the other Allied colleagues by showing the Kodak proofer on a schedule of the Orwell master lease, as though Orwell owned the machine.
The inclusion of the Kodak proofer as part of the Orwell equipment leases [Plaintiff's Exhibit M] was so inaccurate and misleading that the accountants that audited Allied issued a "reportable condition" letter as an amendment to its previous audited statements once the inaccuracy was discovered. While this letter [Plaintiff's Exhibit J] does not indicate anything about the fairness of the transaction, it is certainly an indication of a significant misclassification of the $5000 monthly expense to Orwell.
The evidence is far from clear and convincing that the plaintiff disclosed the details of this arrangement to the Allied board or to Mr. Leamy directly. Rather for several years the $5000 monthly payment to Orwell for the proofer was erroneously carried on Allied's books and financial statements as though it were a rental expense in connection with the other Orwell leases. When Andrew Scanlon, Mr. Leamy's advisor, asked about the $5000 payments after receiving the correction contained in the CT Page 12453 management letter from the auditors, the plaintiff told Scanlon it was a reimbursement to Orwell for expenses related to installation of the machine. That explanation was unconvincing to Scanlon and is unconvincing to the court.
The plaintiff had an affirmative duty to accurately disclose what if any services Orwell was actually performing in connection with the Kodak proofer that were not already well within the province of Allied and its staff to perform. The plaintiff has failed in his burden to show that the benefit he received as an Orwell partner was the result of a transaction that from Allied's perspective was fair, in good faith, and for adequate consideration. Rosenfield v. Metals Selling Corp.,229 Conn. 771, 795 (1994).
CONCLUSIONS
In DN #40 73 61, Cribbin v. Allied Color, Inc., the court finds for the plaintiff Thomas Cribbin on both counts.
The plaintiff is awarded damages and other relief as follows:
(1) Money damages of $152,562.97;
(2) Specific performance of the defendant's obligation to use best efforts to release the plaintiff's personal guaranty from the defendant's loan with First National Bank of New England.
In DN #40 81 70, Allied Color v. Thomas Cribbin and OrwellLeasing Associates, the court finds that Cribbin and Orwell Leasing Associates are liable to the defendant for the expense to Allied of Cribbin's self-dealing regarding the Kodak proofer. Thus the court finds in favor of Allied in its complaint and finds damages to have been proved in the amount of $170,000, representing $5000 monthly payments from October 1994 through May 1997.
Judgment shall enter accordingly.
Patty Jenkins Pittman, Judge